and we'll hear first from Mr. Coon. May it please the court. This court's test for likelihood of confusion under the Lanham Act has been well settled for decades. Typically, it's a fact question and it's determined by considering the court's digits of confusion. But the district court didn't follow it here. Instead, without considering the digits of confusion, the court found likelihood of confusion could not be alleged as a matter of law because the marks were not visible in the text of McNeil's online ads. This per se rule is contrary to the law of this circuit and others and undermines trademark owners' rights online. Now neither the lower court nor McNeil cites any Fifth Circuit authority to support this far-reaching holding that the plaintiff's marks had to be visible in the text of the ads. In fact, this court has held the exact opposite. If you go back first to the Southwest Recreational case, it involved metatags. And metatags are invisible embedded code that has the mark that people put on the website. And in that case, while noting the mark was invisible to consumers, the court held that the test for the action of a trademark infringement was simply whether the use of the mark was This court rejected the idea of a per se rule in the case of invisible tags. In the College Network case, the court held, in that case you had similar to here, they were buying trademarks as keywords, in that case both for Yahoo and Google, and search engine ads. And the court noted that the jury was permitted to view the keyword search process and visually compare the company's websites and determine whether or not there was a likelihood of confusion. Again, it was not a per se rule. And all of the courts, other similar courts, every circuit that's addressed it has reached this same conclusion. I just looked this morning, I was just trying to count them up. In our briefing, we have, in keyword cases, cases from the 11th Circuit, the 2nd Circuit, the 4th Circuit, the 9th Circuit, and the 10th Circuit. In metatags, we have the 1st Circuit, the 7th Circuit, and the 9th Circuit. There's not a single circuit that has created this rule that they're asking you to . . . Are those all cases where the mark did not appear in the ad that the person was directed to? No, they're not all cases where it's not in the ad. What are your best cases there? I mean, I know Judge Boyle in a similar case in Dallas . . . Right. I mean, honestly, the best case is Judge Boyle in the same exact facts against the same defendant. The Reyes case . . . Is there any circuit level case from any circuit that addresses this type of scenario? Well, the 1-800-CONTACTS case that they rely on actually says that there could be a claim. I mean, what they cited for and what the district court cited for is this idea that if it's not in the ad, you can't have a claim, but that's what the trial court said. The Court of Appeals said that that argument had some appeal, quote-unquote, but wasn't accurate and said, you know, if it causes confusion, then you could still have a claim. I mean, if you look at the . . . I mean, obviously, these are still coming up through the district courts, so I think the district court cases are a lot more on point. The Edible Arrangement case, the Hearts on Fire case, I mean, we've cited a lot of district court cases, obviously. There's not as many of the Courts of Appeals cases. Isn't that because . . . isn't the dynamic there that if the court grants trademark . . . whether the court grants trademark protection or confusion or whatever, or denies it on a motion to dismiss, and it goes up, then the parties settle, isn't that what's probably happening? That's what's happened in almost every one of these cases, including cases involving McNeil, when it's been . . . usually what happens is an answer isn't even filed. So we filed four cases in this case, which they pointed out in their brief. Basically, a lot of people are buying Mr. Adler's marks, right? We're not filing suit against everyone who does it. We're filing suit against the worst offenders who are actually confusing consumers. So we filed four lawsuits in Dallas. Three of them were against these . . . they call them lead generators, that aren't lawyers, but like McNeil, trying to farm work out when you get somebody confused to call you. One was against Reyes because he put the mark in the ad. So we felt we didn't have a choice but to name him, and three of those have settled. McNeil is the last standing, but the problem is, if McNeil is right, then bar the door because we won't have any protections. What I would say is this case . . . and I think what happened here is originally these cases were all assigned to different judges, and then after the two didn't settle, they got consolidated with Judge Kincaid, and he assigned them to the magistrate judge. The magistrate had two cases in front of him, one of which had the mark or hammer in some of the ads, and one didn't. He just decided to split the bait, like this seems like a way to differentiate. But that's not a proper basis to do it, and you shouldn't be doing it on a motion to dismiss. I have a question that's not related to the trademark issue, but you mentioned this defendant's a lead generator. I thought you can't pay them a percentage of the case, right? You can't pay a referral fee to a non-lawyer, I thought, right? We don't know the exact specifics about how it works out. There have been a number of lawsuits around the country filed against McNeil for violating the contract, so we've gotten a little peek behind the curtain. My understanding is what they say is they're not being paid part of the fee, they're being paid a fee to refer the case. So it's, you know, depending on what kind of case it is, she gets a bigger or smaller fee. But what I would say is this case has done is it's drawn a road map, you know, for the pirates and cheats that want to come back and violate trademark law. If you look at her ad, right, this is in paragraph 44 of the complaint. You can see that right under Jim Adler, someone searching for Jim Adler specifically, or Texas Hammer specifically, the first ad that pops up is Ms. McNeil's ad. And it doesn't have anything to tell us, you know, who she is or what this is, right? And it says Texas accident lawyers. We know they're not Texas accident lawyers. And it says call today for a free consultation. We know they can't give a free consultation. So what happens? Well, historically, and one of the reasons, to go back to your question, Your Honor, one of the reasons we haven't seen this before is this is new technology she's using, right? And with every advent of new technology, you get a new advent of the pirates and the cheats trying to figure out how to take advantage of it. And in this case, what happens, it's click to call. And all the cases we filed are click to call cases. And what happens is if you touch her ad, right, it doesn't take you to a website. It calls her line, right? You have no ability to check this. I mean, we, you know, there were multiple pictures of that listing. So we don't need you to tell us about them at this point. But what you're saying the thieves and the cheats and the so on, which I don't regard as having a whole lot of legal content to it. And as a consumer, if I am looking for United Airlines, I immediately get three or four different websites that sell United Airlines tickets. And then I get Delta and American and Southwest and, you know, Spirit and whatever. Because they're all engaging in this kind of competition. So how do you distinguish a legitimate pro-competitive use of the keyword as a search mechanism as opposed to what you're describing as initial confusion? I appreciate that question, Judge Jones, and I think that's really the essence of the whole case. Well, you tell me what the essence is. Right. I mean, I think the answer to your question is you've already told us for the last 30, 40 years how to do it, and that's the digits of confusion, right? That's the test that needs to be applied. Now as to the underlying question you're asking, there is, with every use, a legitimate and an illegitimate way to do this, right? And what the decisions talk about, I think that the opinion from, I think it was the Alzheimer's opinion does a good job of this and edible arrangements does a good job about this. But when they talk about it, they say, look, there's different variety, right? And there is the legitimate, competitive, comparative ad, right? And there's the bait and switch, right? And how do you tell the difference? That's the conundrum you're referring to, Judge Jones. And the legitimate, comparative ad, the classic example would be Coke buying Pepsi's site or vice versa, and them saying, you know, Pepsi buys Coke and says, drink Pepsi, not Coke. And they say it'd be a very, you know, a rare consumer that would be confused by that, right? But we don't have that here, right? And the idea that her ad is not marked with any identifying source identifier, the idea that it doesn't have a website you can click through to, the idea that she has no affiliation with the mark, she's not drawing a comparison, right? Now, the problem that we have in this one particular case, in this area, is comparison advertising for a lawyer would be prohibitive, right? I'm not allowed to run an ad and say, I'm a better appellate lawyer than Mr. Cole. It's probably not true, right? But also beyond that, I'm not allowed to make that comparison under the bar rules. I didn't think, she can correct me if I'm wrong, but I didn't think Judge Jones' question was about a comparison ad, you know, where Coke advertises with Pepsi in it. I thought she was just saying people know, you know, she used the airline example, if I search for a specific hotel in New Orleans I want to stay at, I know maybe the first ten things that come up aren't actually going to be that hotel. I didn't say precisely that. I asked him to tell me what he's advocating. But why isn't that, why don't people know that you have to look at what sites you're clicking on because it's not always going to be United Airlines that pops up first? And the answer is no, Your Honor. I know that historically there was this assumption, maybe people would think it's an ad, they would know it's an ad or not know it's an ad, and the reality is they don't. I mean, we've done a double-blind study that shows per ads, with our ads, that we're finding on these searches are 34 to 44 percent. Was your comparison done on mobile phones or tablets? Mobile phones with the exact ads that were showing up in the condition they were being with the idea that these are people who would hire a lawyer online. Well, one article I read said that there's a particular likelihood of confusion on mobile phones just because of the way the searches are designed. That's right, Your Honor, and what we've seen is like in some of these instances on their phone, all they're seeing is one ad, right? All they're seeing is her nondescript ad. Why is that? Because you've got to scroll? Right, right, Your Honor, and she can make her ad bigger so it takes up the whole screen. So all you see on the phone sometimes is you see Texas Hammer, Texas lawyers, call for a free consultation, and if you touch it, you call them, right? And you're not getting through, Your Honor, to those other ads. And, you know, this is about lawyers, right, but just look at the other cases we've cited. There's cases about cookware, there's cases about charity groups, you know, if we're wrong, when you come to New Orleans next time and you decide you want to go to Commander's Palace and you type in Commander's Palace, the first ad that says, you know, oldest dining establishment in New Orleans, click for reservations, might be somebody who's selling, trying to convince you to go to a different place, and when you call, they might be saying, oh, they're booked, but I can get you in, you know, X Place, right, Superior Seafood, right? I mean, that's the problem here is they're taking advantage, and what the cases talk about is the consumer who's searching for a specific brand, right, this is not a consumer who says, I need a lawyer. This is a consumer who says, I'm looking for the Texas Hammer, and typing that in, and that person expects that the results they're going to get back are going to be who they're looking for. Mr. Kuhn, can you hear me all right? Yes, sir. I'll try to speak up. What is different about this case from any fifth circuit case, and it's what the district judge was focused on, is that there's no visible use of the trademark to the consumer other than knowledgeable consumers who go through whatever steps allow you to find out the use of the trademark, and he held as a result of that, because of that, there's no trademark in the ad, that this was not actionable under the Lanham Act. It seems to me, for us to go the other way, and you say you look at the digits of confusion, very little of that would help you, but the one thing that would seem to me that would is that the actual confusion, and I mean, I accept, at least as a matter of potential fact that could be proven if this got beyond this stage of litigation, that you could prove that a fair number of consumers are confused by this sort of thing. Isn't that basically the only digit, I don't know why there are only eight digits of confusion, but nonetheless, that's what we call it, isn't that basically it, and that would be the legal principle that we would have to be holding, that even though there's no visible use of the trademark, the way this whole thing plays out can confuse consumers, and that's a Lanham Act claim. No, Your Honor, I would have to disagree, because if you look at the digits of confusion analysis they did in Reyes, and the digits of confusion analysis they did in Ben Abbott, they found every single digit weighed in favor of us, right? What happened here was not that the digits didn't weigh in favor of us, but the district court said, I'm not going to look at the digits, right? So his question about whether or not Adler has famous marks, it's the same under either one of them. You know, is it the same consumers, right, looking for the same product under the same stream of commerce, every single digit will weigh in our favor, which is why they're not making that, they're not willing to talk about the digits, because as the district court recognized in Reyes and in Ben Abbott, those weigh in our favor, and in particular, what I wanted to point out, Your Honor, this is on a motion to dismiss, and so when they cite these cases and talk about how, I think going back maybe to your question, Judge Costa, about the idea that there's these cases that say, you know, you can't have a claim based on purchasing the trademark alone, those cases, right, were where somebody on my side was going to say, look, they bought the, this is the code for Pepsi, right? Pepsi bought or Coke bought my mark, I have a claim, period, no matter how they used it, and the court said, no, that's not true. What they're doing here is they're flipping it and saying, we cannot as a matter of law pass data claim, and that has to be wrong, right, we have to be able to apply the same exact standards that you have in every other case to come up with the result of whether or not there's confusion. Now, they, I think it was your opponent cited Section 25A.8 of McCarthy, search engine showing targeted advertising author's opinion, I think that they cited, and if you read that, it's only a page and a half, plus a few footnotes, it looks rather skeptical toward this kind of claim and seems to be suggesting that there are a lot of instances where people do cross-selling or selling of competing items and nobody's saying there are trademark violations involved. So, A, do you agree that it's skeptical of this claim you're making, and B, what do you think of the analogies? Before I answer Judge Jones, can I . . . Yeah. I agree that there have been some publications and some professors in law that have said this is maybe a questionable area, but it's one of those areas that's developing. We cite a provision in McCarthy that also talks about it's a rare trademark case that should be granted on a motion to dismiss, right? And the point is, when these cases first came up, right, like I said, it was really what people were asserting was this idea that if you buy my mark, period, it's an infringement. And the court said, no, that can't be right, because there has to be a legitimate way to use it, right? Then, right, what we've seen develop over, since then, is this body of case law we cite where courts say, yes, you could have a claim depending on how it's used. And if we can't have a claim based on how it's used in this case, then, like I said, it's a road map for how to violate the law. All right. Thank you. Thank you. All right. Mr. Cole? Good afternoon. May it please the Court. And it's good to be back in New Orleans. The issue, I want to start with the first set of questions that you asked my opponent about the lack of circuit-level authority on this particular problem. The reason there's a lack of circuit-level authority on this problem, aside of some of the practical issues you talked about, is there's a lack of authority, generally, much less consensus, about this notion of initial interest confusion. There is significant difference among circuits as to whether it exists. If it does exist, what factors you look at, when it can apply, and so on and so forth. And in this circuit, we have a—it has been recognized, but it is in a uniquely limited set of facts. It's this Elvis Presley, Velvet Elvis case, which has these wonderful facts about the Love Me Tender sandwich and all this stuff. But it's a very—it's easy to read and easy to apply, because it says who it can apply to, which was, in that case, the defendant itself, Velvet Elvis and its own work, and what. And went through specific things that they did in their trade dress, and their service mark infringed the trademarks of the Elvis Presley estate. To expand that precedent, in this case, on these facts, would be an expansion of initial interest confusion that's not supported by the current state of the circuit's law, and would become an aggressive expansion of it nationally. You would have circuit authority, but I think it would take the law perhaps too far. I'll talk— What about Erson's concurrence in the Ninth Circuit that I believe has gotten some traction? The Ninth Circuit's approach to this, I found bewildering, and I found it rejected in this—by this court, in this context, in the College Network's case. There was a—there was a line of authority that had a certain set of factors you looked at for the Ninth Circuit, and it said, put that to one side, so I put the Ninth Circuit to one side after I read College Network. Beyond that, I can't speak to that particular opinion. It does seem this is a fact-intensive area. In cases like College Network, I mean, that went to trial, and it was a judgment as a matter of law was what was being appealed. What cases can you point to throwing a claim like this out at the pleading stage? So it is true that most of the cases we cite are summary judgment cases on a record—summary judgment record. College Network, though, that went through trial, but the issue was a matter of law issue. They weren't looking at the trial record, they were looking at points of law. And the discussion in the Southwest, which was also after trial, was also points of law. They could just as easily have been decided at Rule 12. But College Network says there's this legal issue about use that we don't have to decide— That's right. We say there's a— —because the jury was not compelled to find confusion. They find—there are three different things, I think, in College Holdings. They find that factually, confusion was not proven. Right. They find legally the error that's being asserted is not well taken because of this Ninth Circuit thing we're talking about, and that goes out the window, and they're not going to go there, and there's a footnote that explains how they don't evaluate sufficiency under the Fifth Circuit standard. So, yes, there's a discussion of the facts of the case. The legal holding is the error you're asserting is not well taken because we're not going to follow the Ninth Circuit, and you didn't argue the Fifth Circuit until you got to oral argument. The Tenth Circuit case went to trial. So, I mean, what cases are throwing these out at 12b before we know what the evidence on confusion— Right. So, we cite at least one, the Ohio case, towards the end of our first section of briefing on that. I'll freely concede the majority of them are summary judgment cases. That said, you don't have to develop a summary judgment record when two things are true, when not only does the ad not use the trademarks term, but what does appear in the ad are purely generic terms, and that's instructed on this whole digits of confusion thing. We cited already at the beginning of our brief different procedural settings there on that point that says you don't have to go there when you're just looking at what the words are. And the words here, of course, are words like Texas and accident and injury. Suppose—I mean, this is what happened to my judicial assistant one time—suppose a fellow comes to your door, and he's wearing a hat that has Centerpoint Energy on it, and then he says, I'm here to sell you some upgraded electrical equipment so that you can save money on your electrical bill. Well, my J.A. is smart enough to say, oh really, does Centerpoint really sell that? And the answer—and then he scoots away from the door because the answer was no, that he's trying to use Centerpoint Energy as an entree to get into a selling position. Now that involves fraud and who knows what other bad things, but it's an analogy. Why isn't that exactly what your client is doing? So let's park the fraud. The hat, we don't have that, so that's an independent basis. No, the hat is the Adler mark. It occurred to me, your client is using the Adler mark not only as a search keyword, but also, frankly, as the intro to what your client does. Well, we don't do anything with the Adler marks. The ads speak for themselves on that. No, you don't. Ordinary person looking at that, including me, would say, hmm, this is how you contact us. Let's talk about how you get from our case to the guy with the hat, which is, the hat guy is like the doorman in the Elvis case with an Elvis hat or an Elvis picture. He is directly representing the owner of that restaurant, hustling people in the door. Here this guy's running his own hustling business and he's got the false ad on top of his head. What's critical, and I said who at the beginning, the who is how you do these keyword search bidding. There's a third party involved, Google in this case, other search engines. Some people have sued Google too. True. That's true. In fact, Google has won most of them as well. We have a citation in our brief to Google's policy about this. They no longer investigate these claims because they're that convinced of the strength of their legal position. The point there, though, is not just, ha-ha, there's another person, although it is relevant. It's one person removed. It's a market. That's the issue we were talking about, about the limits of these cases in the earlier discussion. When I go to bid on keywords and somebody else goes to bid on them, if you don't like where your ads are coming up, you can bid more. It's like going to the CVS where I just went yesterday looking for some stuff I forgot. Things are located in different places in the store, in part because the store manager thinks he can make more money, in part because the guy that runs the store has contracts with different people, put their goods in different places. The fix is get a better, buy more. Get higher priority. Get a better ad. Do something to compete in that market with that third party. That's why these cases, and that's what McCarthy's doing. You're doing that, your client is doing that precisely in order to confuse the consumer into thinking that the consumer, because of your generic ad and the bidding for the higher priority, doesn't like the analogy in this McCarthy thing where Queen Hunt and H.J. Hines catch them because the consumer then knows about the choice. The cases that have not gone my way on Rule 12 have been cases that, like the point you just made, have said keyword searches by themselves, probably not actionable. If there's something else that's an issue abroad, then you could have a potential claim then. There's some examples of those. I'm just saying, are you denying that the keyword search is a use? It is a use in commerce, no question. We don't dispute that. But you deny it's a use of the mark, right? It's a use of the mark. So our two-part test is, one, was the mark used? Two, is there confusion on both? Right. And so you see a lot of cases that say, if the search process then leads to an ad that says, my product is different from this other trademark product, it is clearly distinct. I forget the exact term of mark, but that idea, a disclaimer, a comparison of some kind, no liability. The case we were just talking about, College Network at the end, when it's talking about the ads in that case, it says, we find there's no basis for confusion, comma, and in fact, we find that there were some disclaimers. This case doesn't involve a disclaimer, obviously, but it involves the opposite. It involves generic terms which are not actionable under the Lanham Act. Texas, injury, and lawyer, not actionable. It's just, you can't bring a claim for that. But hammer is. Texas hammer is. Texas hammer, I'm with you on that. If we said the Texas mallet or the Texas screwdriver, we're probably in some trouble on that. But Texas injury, McCarthy's got a section, Texas toast, I think, has been litigated. Those terms aren't going anywhere. And by using those generic terms that cannot, as a matter of law, be associated with any particular party, in fact, that's the wording they use and they're pleading to describe what we use, we have disclaimed it. You can't tie it to us. I cited McCarthy, 25A.08. And in there, it seems on the whole very diffident about this cause of action. But it does say, and it says, diversion or distraction is not confusion. But it says, initial interest confusion could occur only if the website user mistakenly thought she was going to a website about Toyota, which she was searching for, when she clicked on the keyword link, sorry, she was put into the Toyota one when she clicked on the keyword link for Volkswagen. And there, as Judge Berzon says, there's a dichotomy and a choice. Here you have Adler and then you have Click. Right. And the Click, of course, says nothing. And then you get to our Ad, which doesn't say Volkswagen. It's think of the store guy. You walk in the store and I say, I'd like some Adidas shoes. Well, there's some other shoes I have over here. They don't have an Adidas label on them. They say generic shoes on them. That's diversion. That's not confusion. Because I'm not trying to suggest that they are, in fact, Adidas shoes. I'm not doing anything that says Adidas something else on the name or some fancy spin or anything like that. It's simply an absence. It's the reverse of a disclaimer, but it is something, here's what they say and they're pleading about that. Generic terms that consumers might associate with any personal injury firm. That means they don't have content in describing a particular energy firm. I think Judge Costa asked this already. What is the case that is most analogous to your client's situation? The best discussions of the issue of the who. I got two cases. 1-800-CONTACTS and the Alzheimer's case are the best cases for us. And there are discussions of this issue on the trademark, the keyword search part of the case. On the facts . . . You think Judge Boyle's opinion you think is wrong. You have to think it's wrong. That's correct. I think Judge Boyle's opinion is in the gray area that Elvis leaves open. The Elvis Presley case says if it's your own actions, which search engine keywords aren't, and it's deceptive, which we aren't because we're using generic terms, you've got a claim. It's still in the Elvis place. Now it's just the Velvet E. I saw one the other day that must have some deal. It was in a shopping strip somewhere. I don't have a case where someone said, you don't use the term and you're only using generic words because nobody's going to litigate that case, certainly all the way to the circuit. The points are just obvious. There's tons of cases that are diffident, to use Judge Jones' word, about when you're not using the trademark. And there are cases that are very strong about the inability to make whanamatic claims about generic terms. You put those together, you're dead in the water. You don't have a claim at the outset of things, particularly given their own concession, that this is the outlier case. But the real question is, maybe you end up winning, but why is this outside the normal case where once you have a use in commerce, which you've conceded, we would look to the digits of confusion? Because there's no reason to look to the digits of confusion because there's nothing to be confused about. There's no use, there's no appearance of the phrase. Well, they're typing in the Texas Hammer, it brings them to this, they click on it, they call the number, and they just say, oh, have you been hurt in a car wreck? I mean, they don't say McNeil Consultants. Right, they don't have a disclaimer. I mean, this is all obviously well scripted and planned out. Right, because we don't want to get caught in that law either, but we don't have, there's no law anywhere that says you always have to have a disclaimer. What the law says is, as long as you don't have a probability of mixing up the trademarks, the service marks, then you're good to go. When you reverse the dismissal and it goes back for evidence, they claim they have proof that 30 to 40 percent of consumers were misled. Yeah, I'm baffled by that. It compares, of course, their ad with our ad. Our ad, of course, we've talked about that, generic terms that they say can be associated with any law firm. That just means they have lousy trademarks. I mean, of course, the problem is we don't have the evidence. But they have not described evidence that would be helpful. They're saying that 30 percent of people are confused about a trademark that doesn't hold up against generic words like Texas and injury. That's not a good trademark. The question is, we're at Rule 12, so it's plausible. The question is, is it plausible? Why isn't it plausible that someone who types in Texas Hammer, Jim Adler, this comes up on their phone, they click on the phone number, they call, we know what they say on the script.  Who do they think we are? Do they think we're Jim Adler or not Jim Adler? I guess what I'm confused about is... You don't say who you are. We don't pretend to be him. We don't say we're Jim Adler. We don't use any of his trademark terms. It won't be a matter of time until they say, oh yes, well, there's a lawyer named Tom Adler that I think would be just the reason. Look, if we said the Texas Mallet or something, or God forbid we said Texas Hammer, by the way, that's what most of these cases about the phrase doesn't appear in the ad or talking about is confusingly similar phrases. No one's going to actually put it in there. They're going to put Velvet Elvis or something like that. But if we said Texas Mallet, we'd have a problem. That would be plausible. But we've taken some care here, and they acknowledge it and admit it, and they're pleading to only use generic words that aren't connected to a firm. There's no duty to always make a disclaimer whenever you use a generic term. In fact, the Lanham Act says you shouldn't. Who's going to bid more to have their actual information right beneath Adler? Think about the Yellow Pages. Remember those? Remember the Yellow Pages? People did that. They paid money. I didn't know anything about that. I was just a capitalist. I ignored anything that said AAA.  They paid a ton of money to put their ad next to their competitor's ad in the Yellow Pages, and they paid a ton of money to be AA, AAA, AAA bail bonds. And that's just the way advertising works. And that's the stuff that McCarthy's section is talking about. When you have a third party and you have a market in advertising, people are going to buy and sell ads. And for us to say, in that market, when you're buying and selling words that otherwise would have no trademark connection at all because they're generic terms, you better have this disclaimer on there, that seizes up the market. That is an expansion of the Lanham Act into areas where it should not go, where this Court has not placed it. And it's one case on this issue that was much more limited to some unusual facts about someone dressed up like Elvis Presley. We are looking at relatively new technology, not that particularly new, but certainly the case law is still developing. It seems to me the principal problem creating confusion, and we all acknowledge what the facts show, is that those who are searching, and maybe 30 or 40 percent of those who are searching, are looking for Jim Adler. It's like what comes up is Jim Adler. And if you ever said McNeil somewhere, this is McNeil Consulting, we can refer you to a lawyer, that would take care of the problem. That's the equivalent, I guess, of a disclaimer, what you've been talking about. But it seems to me as this develops, rather than being some horrendous expansion, it is an opportunity for this Court to say, what kinds of confusion this new technology makes possible? What kind of confusion still falls within the Lanham Act? And it seems to me the whole business model of McNeil, with respect for whatever else may be going on, is to create the very confusion that Adler is talking about. And it's working, according to the evidence that might get presented if this moved beyond this stage of the proceedings. It's certainly an opportunity for this Court to create this law. No other circuits have spoken to the issue. There just aren't that many opportunities. Here it is. And so this Court has that chance today for this circuit, and really for the country. But if you create a rule, Judge Southwick, that creates liability here, you're going to be saying that three things, in order to get there, all three have to be true. If you buy in keywords through the keyword search process, and if you do not use the trademark terms or a confusingly similar term in your later communication, and in fact, third, limit that communication to generic terms, you can be liable. That's an expansion. Well, this expansion is only when you hide who you are. If you ever said who you were, then the problem would go away. The Internet allows you to hide your identity. There's not a case I've seen about the use of generic terms that requires a disclaimer along with them. Once you're generic, you're just generic. You're outside the scope of the Lanham Act. You're not generic, but not if you get there through certain means. You're just generic. The English language is just the English language. Certain words are just off limits. And to say, well, how you get to those words creates the Lanham Act issue, that's a big deal. That's a big expansion. And we're expanding here not just, I know we're talking about the Lanham Act and the statute itself, but we're talking about an unusual area of liability under initial interest confusion, which are circuits that don't think that's a cause of action that the Lanham Act addresses at all. We're taking that phrase and expanding it way out. And I think this is just not the case to do that. The principles that should be affirmed here are, look, fancy technology, no question, but basic principles. The terms aren't there. Confusingly similar terms are not there. Generic terms are used. The process is one that is just like traditional advertising for many, many years in stores and Yellow Pages ads. We're not going to extend initial interest confusion to that. The next case that comes along, all these other cases he's talking about, maybe we litigate that. By the way, this business, it's completely legal. Advertising and bundling ads and marketing, that's legit. McCarthy talks about that. The State Bar has approved the practices of our client here. I know he doesn't like it. That's competition. He doesn't like that we're competing with him in the marketing space. We're allowed to do that, and the Lanham Act is supposed to encourage that within the rules that it sets out. Thank you. Thank you. You would have the court believe that Adler has such horrible trademarks that his client is willing to pay hundreds of thousands of dollars to buy them to get in position right underneath Adler's search terms. Right? It's not a credible argument. And this argument he makes about this being about generic terms is so transparent. We're not suing him, as Judge Jones noted. We're not suing him over generic terms. If he wants to run the same ads, I'm sorry, McNeil, if she wants to run the same ads, same exact ads, and just don't buy our keywords, it wouldn't be actionable because she wouldn't be running a scam to confuse consumers. But that's why this is a claim. And the person trying to change the law here is McNeil. All we're saying to do is to apply the same digits of confusion that you have done since before probably any of us were practicing law. Right? We're saying don't change the rule. And the reason is the rule makes sense. The way we evaluate whether or not when new technology comes up, when they find out a new way, and Judge Jones, just to go back to your point earlier, when I call them pirates and cheats, that's what the Senate called them when they passed this Lanham Act back 75 years ago. And I don't mean that pejoratively. I mean, that's the point of the Act. We're trying to catch people trying to trick people. And that's what this is about. It's not about generic terms. It's not about generic terms. And if you apply... Let me suggest, if McNeil was a lawyer and tried this ruse, would that be an ethical violation? I think it could be, Your Honor, because when he talks about that ethics opinion, what that ethics opinion says is, look, in the scenario where Lawyer A buys a keyword and they run an ad that says Lawyer A and it has a description of that lawyer and their service and then has a link to their webpage, right, that that probably isn't an ethical violation. But that's not what's happening here. So, if McNeil represented only one lawyer, this would be very problematic. But McNeil represents presumably various law firms. We don't know who she represents because we haven't been able to get to discover, Your Honor. But if McNeil ran an ad and she said, we are a lawyer referral service, we are not a law firm, click here to go to our website and learn more information, we probably wouldn't be standing here, right? But what she does is a click-to-call ad that connects to her call log or to her call group and they say, oh, have you been injured in an accident? Oh, tell us about your accident. And they lead them to believe that it is Adler or a call center associated with Adler. They go through this entire script, keep it on the phone for 10 or 15 minutes, and then say, you know what? Maybe Adler's not the right lawyer for this case. Let me tell you who I think I would recommend, right? And the consumer may never know that they weren't talking to Adler. Right? That's the confusion we're talking about. When he talks about the initial interest confusion, the only case he has, the only case, is an unpublished opinion from the Eastern District of Pennsylvania. And what it says is, the Third Circuit hasn't adopted the initial interest confusion. Every other circuit that has, has found that there are these protections. But I'm going to reject all of those cases. That's the J.G. Wentworth case, right? That's not the law in the Fifth Circuit, and it shouldn't be in the law in the Fifth Circuit. If you let him do what he wants to do, it's going to be open season on trademarks, because they know now, with click-to-call, you have a whole new way to confuse a whole generation of searchers. Um, the last point I'd make about Google, and Judge Southwick, you were on this opinion, I know, recently. We said, Google is not the arbiter of law. Google makes 90%, 97% of its business from ads. I'm not surprised that Google lets you buy somebody else's mark. I'm surprised we would argue they should be the arbiter of what is legally true. Thank you.